## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

ROBERT DANA WOODARD,

          Plaintiff,

vs.

EDWARD O'BRIEN, JERRY CONNELLY,
DURGA SATYAVOLU, SALLY POTTER,
and LINDA BOFFELI,

          Defendants.

No. C07-0121-MWB

**REPORT AND
RECOMMENDATION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

———————————————

This matter concerns events that occurred while the plaintiff, Robert Dana Woodard, was incarcerated in the Anamosa State Penitentiary ("ASP") in Anamosa, Iowa, from August 30, 2006, to October 7, 2008. Woodard claims that while he was incarcerated in ASP, the defendants were deliberately indifferent to his serious medical needs. The defendants deny Woodard's allegation that they were deliberately indifferent to his serious medical needs. They also argue Woodard has failed to exhaust his administrative remedies. Alternatively, the defendants argue they are entitled to qualified immunity from monetary damages.

## I. PROCEDURAL BACKGROUND

Woodard filed this case on October 30, 2007. On April 10, 2008, the court issued an Initial Review Order directing service of the Complaint on the defendants, and setting an Answer deadline of June 9, 2008. Doc. No. 6. Attorney Patrick Ingram was appointed to represent Woodard in this matter, and Mr. Ingram entered an appearance on May 14, 2008. Doc. No. 11. On June 9, 2008, the defendants filed their Answer, denying Woodard's substantive allegations, and asserting affirmative defenses. Doc. No. 13.

On July 15, 2008, Woodard submitted a *pro se* motion for appointment of an expert medical witness and for payment of the expert's fees. Doc. No. 16. He also filed a *pro se* motion for injunctive relief to require ASP officials to comply with the medical orders from the University of Iowa regarding Woodard's care, and a motion for depositions of certain witnesses. Doc. No. 17. All three motions were docketed as sealed *pro se* correspondence and forwarded to Mr. Ingram for further action. *See* Docket text for Doc. Nos. 16 & 17. On August 4, 2008, Woodard sent a letter to the Clerk of Court to determine whether his *pro se* motions had been received. A Deputy Clerk advised Woodard that his motions had been forwarded to his attorney. Doc. No. 18.

On August 15, 2008, Woodard filed a *pro se* motion for dismissal of Mr. Ingram as his attorney and appointment of a new attorney to represent him. Woodard alleged Mr. Ingram was not representing his interests adequately, and Woodard had filed a grievance against Mr. Ingram with the state bar association. Doc. No. 19. On August 20, 2008, Mr. Ingram filed a motion to withdraw. Doc. No. 21. The court granted Woodard's motion for new counsel and Mr. Ingram's motion to withdraw, and appointed Jeffrey Lipman to represent Woodard. Doc. No. 22. Mr. Lipman entered an appearance on September 16, 2008. Doc. No. 25. On October 6, 2008, Mr. Lipman filed a designation of expert witness, and a request for payment of the expert's fees. Doc. Nos. 27 & 28. The request for expert fees was granted. Doc. No. 29. The court granted the defendants' motion to extend the deadline for dispositive motions in the case while the parties awaited review of Woodard's medical records by his expert witness and receipt of the expert's report. Doc. Nos. 30 & 31. On February 15 and 19, 2009, Woodard wrote to the Clerk of Court inquiring about the status of his case. Doc. Nos. 32 & 33. Copies of the letters were forwarded to Mr. Lipman for further action. *See* Doc. No. 33.

On March 17, 2009, the court granted the defendants' motion for leave to file a dispositive motion out of time, Doc. Nos. 34 & 35, and the defendants filed a motion for summary judgment and supporting documents. Doc. No. 36. The case was referred to

the undersigned for review and the preparation of a report on and recommended disposition of the defendants' motion for summary judgment. Doc. No. 37.

On June 8, 2009, Mr. Lipman filed a copy of the expert witness's report, together with a motion to withdraw as Woodard's attorney and a supporting brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 13 L. Ed. 2d 493 (1967).[1] Doc. No. 40. The court denied Mr. Lipman's motion to withdraw, but indicated the brief submitted with the motion would be considered as part of the summary judgment record. Doc. No. 41. The court also authorized Woodard to file a *pro se* resistance to the motion for summary judgment, setting a deadline of July 31, 2009. *Id.* On June 19, 2009, Woodard filed a motion for extension of time to resist the motion for summary judgment. Doc. No. 43. The court found the motion to be moot based on the July 31, 2009, deadline, and directed the Clerk of Court to docket Woodard's motion as a partial resistance to the motion for summary judgment. Doc. No. 42; *see* Doc. No. 43.

On June 29, 2009, Woodard wrote a *pro se, ex parte* letter to the court alleging the Iowa Department of Corrections ("Iowa DOC") had falsified portions of his medical records. The court scheduled a hearing with Woodard and the parties' attorneys to discuss the matter, and as a result of the hearing, the court ordered Mr. Lipman to assist Woodward in preparing an affidavit regarding his allegation that his records had been falsified. Doc. Nos. 44, 45 & 46.

On July 28, 2009, Woodard submitted a *pro se* resistance to the defendants' motion for summary judgment. Doc. No. 47. On July 30, 2009, he submitted a supplemental resistance. Doc. No. 48. On August 3, 2009, the defendants filed a reply to Woodard's

---

[1]*Anders* stands for the proposition that when an attorney representing a criminal defendant on appeal, or a petitioner in a habeas action, finds the case "to be wholly frivolous, after a conscientious examination of it, [counsel] should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744, 87 S. Ct. at 1400. The defendant may respond, and then if the court, on its own review of the record, agrees the case is wholly frivolous, the court may grant the motion to withdraw and dismiss the case. If, on the other hand, the court finds any of the claims not to be frivolous, then the court must provide the assistance of counsel to argue the case. *Id.*

*pro se* resistances. Doc. No. 49. On August 11, 2009, Mr. Lipman filed Woodard's affidavit regarding his allegation that his medical records had been falsified, and an appendix containing 86 pages of Woodard's medical records. Doc. No. 50. On September 25, 2009, the defendants filed a reply and resistance to Woodard's affidavit. Doc. No. 55. On December 9, 2009, Woodard sent a letter to the court containing additional arguments regarding his case, Doc. No. 57, which the court deems to be a further *pro se* resistance to the motion for summary judgment.

The motion is now fully submitted, and the court turns to consideration of the defendants' motion for summary judgment.


## II. APPLICABLE LAW

### A.   *Summary Judgment Standards*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and provides that either party to a lawsuit may move for summary judgment without the need for supporting affidavits. *See* Fed. R. Civ. P. 56(a), (b). Rule 56 further states that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). A court considering a motion for summary judgment "must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts." *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 828 (N.D. Iowa 2004) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); and *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). However, "'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v.*

*DeStefano*, ___ U.S. ___, ___, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)).

The party seeking summary judgment must "'inform[ ] the district court of the basis for [the] motion and identify[ ] those portions of the record which show lack of a genuine issue.'" *Webster Indus.*, 320 F. Supp. 2d at 829 (quoting *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992), in turn citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)). A genuine issue of material fact is one with a real basis in the record. *Id.* (citing *Hartnagel*, 953 F.2d at 394, in turn citing *Matsushita*, 475 U.S. at 586-87, 106 S. Ct. at 1356). Once the moving party meets its initial burden under Rule 56 of showing there is no genuine issue of material fact, the nonmoving party, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Webster Indus*, 320 F. Supp. 2d at 829 (citing, *inter alia*, *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; and *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)).

Addressing the quantum of proof necessary to successfully oppose a motion for summary judgment, the Supreme Court has explained that the nonmoving party must produce sufficient evidence to permit "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Furthermore, the Supreme Court has held the trial court must dispose of claims unsupported by fact and determine whether a genuine issue exists for trial, rather than weighing the evidence and determining the truth of the matter. *See Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510; *Celotex*, 477 U.S. at 323-24, 106 S. Ct. at 2552-53; *Matsushita*, 475 U.S. at 586-87, 106 S. Ct. at 1356.

The Eighth Circuit recognizes that "summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (citing Fed. R. Civ. P.

56(c)). The Eighth Circuit, however, also follows the principle that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting *Celotex*, 477 U.S. at 327, 106 S. Ct. at 2555); *see also Hartnagel*, 953 F.2d at 396.

Thus, the trial court must assess whether a nonmovant's response would be sufficient to carry the burden of proof at trial. *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552; *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990). However, if the court can conclude that a reasonable jury could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir. 1991); *Woodsmith*, 904 F.2d at 1247.

### B.      *Overview of Civil Rights Claims under 42 U.S.C. § 1983*

Title 42 U.S.C. § 1983, in relevant part, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685, 98 S. Ct. 2018, 2033, 56 L. Ed. 2d 611 (1978). However, 42 U.S.C. § 1983 provides no

substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811, 127 L. Ed. 2d 114 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S. Ct. 1905, 1916, 60 L. Ed. 2d 508 (1979). "One cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617, 99 S. Ct. at 1916. Rather, 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983. *See also Albright*, 510 U.S. at 271, 114 S. Ct. at 811 (42 U.S.C. § 1983 "merely provides a method for vindicating federal rights elsewhere conferred"); *Graham*, 490 U.S. at 393-94, 109 S. Ct. at 1870 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S. Ct. 2502, 2504, 65 L. Ed. 2d 555 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution). Thus, to state a claim under 42 U.S.C. § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55, 101 L. Ed. 2d 40 (1988).

## C.     *Law Applicable to Deliberate Indifference Claims*

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. Accordingly, the treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 831-32, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994); *Helling v. McKinney*, 509 U.S. 25, 31-32, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993). In its prohibition of cruel and unusual punishments, the Eighth

Amendment places a duty on jail and prison officials to provide inmates with necessary medical attention. *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 2326-27, 115 L. Ed. 2d 271 (1991); *Weaver v. Clark*, 45 F.3d 1253, 1255 (8th Cir. 1995). In this context, a prison official violates the Eighth Amendment by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm. *Weaver*, 45 F.3d at 1255 (comparing *Estelle v. Gamble*, 429 U.S. 97, 104-105, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976) (existing medical needs) with *Helling*, 509 U.S. at 33-34, 113 S. Ct. at 2480-81 (risk of future harm to health)).

An Eighth Amendment violation occurs only when two requirements are met: (1) "the deprivation alleged must be, objectively, 'sufficiently serious,'" and (2) the "prison official must be, as a subjective state of mind, deliberately indifferent to the prisoner's health or safety." *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995) (citations omitted). *See also Helling*, 509 U.S. at 32, 113 S. Ct. at 2480; *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292; *Jolly v. Knudson*, 205 F.3d 1094, 1096 (8th Cir. 2000); *Williams v. Delo*, 49 F.3d 442, 445-47 (8th Cir. 1995). In the context of a prisoner's claim of inadequate medical care, society does not expect that prisoners will have unqualified access to health care. *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). Consequently, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. (citing *Estelle*, 429 U.S. at 103-04, 97 S. Ct. at 290). *See also Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324.

To constitute an objectively serious medical need or a deprivation of that need, the need or the deprivation either must be supported by medical evidence or must be so obvious that a layperson would recognize the need for a doctor's attention. *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995); *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991). *See, e.g., Beyerbach*, 49 F.3d at 1326-27 (insufficient evidence of objective seriousness when there is no medical evidence that delay in treatment produced any harm);

*Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (insufficient evidence of serious medical need when the medical need claimed is based on bare assertion of inmate). The objective portion of the deliberate indifference standard requires a showing of verifiable medical evidence that the defendants ignored an acute or escalating situation, or that delays adversely affected the prognosis given the type of medical condition present in the case. *See Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997) (citing *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997), and *Beyerbach*, 49 F.3d at 1326). *See also O'Neil v. White*, 221 F.3d 1343, 1343 (8th Cir. 2000) (citing *Crowley*, 109 F.3d at 502).

To meet the second requirement, the "subjective" component of an Eighth Amendment claim, a prison or jail official must have a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297-303, 111 S. Ct. at 2323-26; *Hudson*, 503 U.S. at 8, 112 S. Ct. at 999. In a medical needs claim, that state of mind is one of "deliberate indifference" to inmate health. *Farmer*, 511 U.S. at 838-39, 114 S. Ct. at 1979-80; *Helling*, 509 U.S. at 32, 113 S. Ct. at 2480; *Wilson*, 501 U.S. at 302-303, 111 S. Ct. at 2326; *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292. Regarding the meaning of the term "deliberate indifference," the United States Supreme Court has explained:

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

*Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. Thus, to establish the second requirement, "deliberate indifference," a plaintiff must assert facts showing the defendant actually knew of and disregarded a substantial risk of serious harm to the prisoner's health or safety. *Id.*, 511 U.S. at 840-47, 114 S. Ct. at 1980-84; *Helling*, 509 U.S. at 32, 113 S. Ct. at 2480.

Medical treatment that displays "deliberate indifference" violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05, 97 S. Ct. at 291. *See also Foulks v. Cole County*, 991 F.2d 454, 456-57 (8th Cir. 1993). Negligent acts by prison officials, however, are not actionable under 42 U.S.C. section 1983. *See Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670, 88 L. Ed. 2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 333-34, 106 S. Ct. 662, 666, 88 L. Ed. 2d 662 (1986); *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292; *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992). Further, an inmate's disagreement or displeasure with his course of medical treatment is not actionable under 42 U.S.C. § 1983. *Dulany*, 132 F.3d at 1239-44 (8th Cir. 1997); *Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993); *Davis v. Hall*, 992 F.2d 151, 153 (8th Cir. 1993) (per curiam); *Warren v. Fanning*, 950 F.2d 1370, 1373 (8th Cir. 1991); *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990); *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990).

### III. MATERIAL FACTS
### AND ANALYSIS OF DELIBERATE INDIFFERENCE CLAIM

The pleadings, briefs, affidavits, and exhibits reveal the following facts, viewed in the light most favorable to Woodard, as the nonmoving party. Notably, piecing together the relevant facts in this case was difficult because neither the plaintiff nor the defendants provided the court with copies of the plaintiff's medical records. Similarly, the plaintiff's expert Dr. Jason Ekwena indicated he had difficulty reviewing the case because the records presented to him for review were not comprehensive or complete. He received no progress notes from the DOC health services, and he observed "a lot of

gaps" in Woodard's records, and "references to events with no corresponding data."
Doc. No. 40-2, p. 2.

Woodard was an inmate at ASP from August 30, 2006, to October 7, 2008. During that time, the defendant Edward O'Brien was a physician at the Iowa Medical Classification Center, acting in a supervisory capacity over physicians within the Iowa DOC. The defendant Jerry Connelly was Nursing Services Director at ASP. The defendant Durga Satyavolu was a doctor at ASP. Sally Potter and Linda Boffeli were nurses at ASP.

When Woodward entered ASP, he was experiencing problems with his left eye. His problems started with floaters in his eye, redness, pain, and blurriness, which progressed into severe pain, persistent infections, and blindness in his left eye. Doc. No. 7, p. 3. Woodward was referred to a specialist in the Ophthalmology Clinic at the University of Iowa Hospitals and Clinics ("UIHC"). From his review of Woodard's medical records, Dr. Ekwena provided the following summary of the course of Woodard's treatment at UIHC:

> [Woodard] was referred to UIHC ophthalmology where he underwent screen tests and cultures and several eye procedures and was ultimately diagnosed with chronic uveitis which was at a point linked to some fungal infection. His vision progressively deteriorated. He underwent various treatments including but not limited to kenalog injections, anti-fungal medications, vitrectomy and Retisert implant OS in 12/06, and pars plana vitrectomy, membranescleral buckle, endolaser, injection of amphotericin and voriconazole, gas fluid exchange retinal reattachment in 01/07. Finally on 07/02/07 he had enucleation of the left eye and subsequently received an artificial eye implant.

Doc. No. 40-2, p. 1.

Woodard claims that on April 20 and May 23, 2007, doctors at UIHC recommended he receive stronger pain medications than he was receiving at ASP, but the prison officials did not give him "sufficient pain relief or even a bag of ice," and "made

him walk to pill line for his eye drops which increased his pain." Doc. No. 7, p. 3. He further claims that despite his repeated verbal and written requests to the ASP health services, the defendants ignored his complaints of increasing pain and decreasing vision in his eye, and the visible evidence of increasing infection in his eye. According to Woodard, the defendants caused him to suffer severe, needless pain, and their failure to obtain emergency treatment for him ultimately required the removal of his left eye. Woodard further contends that following the surgery to remove his eye, UIHC doctors told him that he likely would suffer severe pain for two to three weeks, but the defendant Linda Boffeli told him "he could not have pain since his left eye was removed and told him he would be locked up until he agreed to say his pain was a 3 and that Tylenol #3 would work." *Id.*

Woodard claims the defendants failed to follow his UIHC doctors' orders, delayed his return visits to see the UIHC doctors, denied him pain medications, and caused him needless pain and suffering. *Id.* Woodard has prepared a detailed chronology of the events leading to removal of his eye, from his point of view. *See* Doc. No. 47. Among other things, he asserts that UIHC doctors told him he suffered a retinal tear that "was likely due to improper healing of eye after surgery" when the defendants ignored his doctors' aftercare instructions. *Id.*, ¶ 4. He claims a delay of thirty-three days between his retinal surgery and the next time he was transported to see UIHC doctors resulted in "irreversible damage" to his eye. *Id.*, ¶ 4. He further claims his wife finally called the UIHC doctors and asked them to call the ASP warden, and he was taken to the UIHC clinic the next day. *Id.*

Dr. Ekwena observes, in his report, that Woodard's interactions with ASP staff did not go well, and he opines "the staff could have exhibited more empathy given the potential frustration inherent in a condition such as [Woodward's]." Doc. No. 40-2, p. 3. The doctor indicated it was "difficult to determine if the ultimate outcome of [Woodard's] left eye would have been otherwise given the chronicity of his condition, complexity and

the co-morbid pathologies," noting Woodard "had compounding medical variables which made it . . . difficult to identify the etiology of his pathology and that complicated the treatment process." *Id.* In Dr. Ekwena's opinion, the defendants' actions did not rise to the level of medical negligence, and he found "nothing specific in [Woodard's] records . . . that would clearly confirm his allegations of medical indifference." *Id.*, pp. 2-3.

The defendants argue there is no evidence they were deliberately indifferent to Woodard's serious medical needs, and "the record is clear that the Defendants promptly and properly cared for [Woodard]." Doc. No. 36-2, p. 3.

The court does not find the record to be "clear" in this regard. Taking Woodard's chronology as true for purposes of the defendants' motion for summary judgment, the court finds there are disputed issues of material fact regarding whether the defendants responded promptly and appropriately to Woodard's complaints of pain, whether they properly followed the instructions of Woodard's doctors at UIHC, and whether their failure to provide Woodard with appropriate, timely medical treatment caused him to suffer physical pain and suffering and/or resulted in the ultimate removal of his left eye.

Woodard has presented more than a "mere difference of opinion over matters of expert medical judgment of a course of medical treatment," as argued by the defendants. Doc. No. 26-3, p. 5 (citing *Taylor v. Bowers*, 966 F.3d 417 421 (8th Cir. 1992); *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996); *et al.*). On this record, Woodard exhibited objective symptoms that his eye condition was deteriorating rapidly and that he was in severe pain. Taking Woodard's allegations as true, the ASP health services personnel largely ignored his complaints and pleas for assistance. On this record, the defendants did not merely fail to implement a course of treatment requested by a prisoner, they failed to follow the directions of the prisoner's physicians. Woodard has asserted facts showing the ASP health care personnel actually knew of and disregarded a substantial risk of serious harm to his health. *See Farmer*, 511 U.S. at 840-47, 114. S. Ct. at 1980-84; *Helling*, 509 U.S. at 32, 113 S. Ct. at 2480.

Dr. Ekwena's opinion that the defendants' care did not "appear to constitute medical negligence" is not dispositive, nor is his statement that he was "hard pressed to validate the merits" of Woodard's allegation that the UIHC treatment orders were not followed. *See* Doc. No. 40-2, pp. 2-3. Dr. Ekwena acknowledges that he was not provided thorough and complete medical records for Woodard. He stops short of opining that the defendants were not deliberately indifferent to Woodard's serious medical needs, instead opting to state he could find "nothing specific" to "clearly confirm" those allegations. Whether the defendants were deliberately indifferent to Woodard's serious medical needs is a question best resolved at trial, when the court has the opportunity to review all of the relevant evidence.

For purposes of summary judgment, the court finds that as to all of the defendants except Edward O'Brien, Woodard has met his burden to show sufficient facts to permit a reasonable trier of fact to find in his favor. Accordingly, absent some other basis for doing so, summary judgment should not be granted as to those defendants. However, Woodard has alleged no facts to show that Dr. O'Brien actually knew of and disregarded Woodard's serious medical needs. Therefore, summary judgment should be granted as to Dr. O'Brien.

The defendants argue other grounds exist for granting their motion; i.e., that Woodard failed to exhaust his administrative remedies, and that the defendants are entitled to qualified immunity. The court will address each of these arguments.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The defendants also assert they are entitled to summary judgment on procedural grounds, arguing Woodard failed to exhaust his administrative remedies prior to filing this lawsuit. *See* 42 U .S.C. § 1997e(a) (requiring exhaustion of administrative remedies prior to filing an action under federal law). The defendants argue that although Woodard filed five separate grievances during the time period at issue here, "he did not exhaust all

procedures in the grievance policy concerning these five grievances," nor did all five of the grievances "pertain to the issues he raises in this case." Doc. No. 36-2, p. 9. Woodard argues he did properly exhaust the administrative process. Doc. No. 7, p. 2.

ASP's Offender Grievance Procedures are included in the record as an attachment to the defendants' motion. *See* Doc. No. 36-4. Among other things, the Policy and Procedures document defines "Informal Resolution" as follows: "A genuine attempt by the grievant, with the assistance of their counselor, living unit manager, or administrative staff, to correct the perceived problem." *Id.*, p. 12. A "standard" grievance is a non-emergency complaint. An "emergency" grievance is one where there "[a]ppears to be a substantial risk of physical injury or other serious and irreparable harm if regular time limits are followed." *Id.* A grievance may be classified as "Other" for "Incomplete forms, no informal resolution attempt, previously grieved, insufficient information, etc." *Id.*

The institution's grievance procedure requires an inmate to follow several steps. Before filing a grievance, an inmate "must attempt to resolve the grievance informally." *Id.*, p. 15, ¶ B.1. Next, the inmate must submit the grievance in writing using the proper form. *Id.*, ¶ B.2. The inmate will receive a receipt form within seven days, and, in most cases, a written response within twenty-one days. *Id.*, pp. 15-16, ¶ B.3. If the inmate is dissatisfied with either the initial response or the decision on the grievance, then the inmate "*may* appeal the initial response" to the Warden or Superintendent within fifteen days. *Id.*, p. 17, ¶ 2 (emphasis added). If the inmate is dissatisfied with the Warden's or Superintendent's response, then the inmate "*may* appeal the Warden's/Superintendent's response" to the Grievance Appeal Coordinator. *Id.*, ¶ 4 (emphasis added). The time limits for appeals are mandatory. *Id.*, ¶ 1.

The record indicates Woodard filed seven grievances during the period in question, rather than five as stated by the defendants in their motion. *See* Doc. No. 36-4, pp. 28-29, 31-32, 34-35, 37-39, 41-47, 49, 51-52. Woodard filed an Offender Grievance

Complaint on October 11, 2006, in which, among other things, he asks that he be provided with glasses for reading and writing as prescribed by UIHC doctors. In the grievance, he states his doctor prescribed glasses until Woodard got over an eye infection. Doc. No. 36-4, pp. 28-29. On the grievance form, Woodard indicated he had attempted informal resolution with "Infirmary Personal [sic]." *Id.*, p. 28. Woodard termed his grievance as "Emergency." *Id.*

Woodard's grievance was not processed. A box on the Grievance Acknowledgment and Receipt form was checked indicating Woodard had "not attempted informal resolution" of the problem with his "counselor, administrative staff, or living unit supervisors before filing a written grievance." Doc. No. 36-4, p. 30. In the Comments section, the grievance officer indicated, "You must provide the names of the staff you spoke with concerning this matter." *Id.* In addition, the form indicates the grievance officer decided to treat Woodard's grievance as "standard," rather than as an "emergency." *Id.* There is no indication that Woodard followed up on this grievance by resubmitting the form with the names of the staff he spoke with concerning the matter.

On December 28, 2006, Woodard filed a grievance in which he stated he had undergone eye surgery and additional procedures involving doctors sticking needles into his eye. According to Woodard, the procedures were "extremely painful" and the doctor prescribed a strong pain medication. However, when he was returned to ASP, the ASP doctor stated Woodard did not need the prescribed medications and told him to take Tylenol, which Woodard indicated "doesn't even touch the soreness in my eye." *Id.*, pp. 31-32. Woodard indicated his grievance was an "emergency." Woodard did not sign the grievance form, nor did he indicate he had attempted informal resolution of his grievance. *See id.*

Woodard's grievance was not processed, again because he had not attempted informal resolution, but also because he did not sign the grievance form and because he "[did] not provide sufficient details, i.e., what has happened, when, who was involved,

how you know about it, etc. in order to allow for a meaningful investigation." *Id.*, p. 33. Also, again, the grievance officer chose to treat Woodard's grievance as "standard," rather than as an "emergency." *Id.*

Woodard immediately filed another grievance, this time signing the form and asking that he be given the medication prescribed by the UIHC doctors. He indicated he had attempted informal resolution with "Medical." He again classified the grievance as an "emergency." *Id.*, pp. 34-35. He also went into more detail, stating the medical personnel who were denying him his medications were "Dr. Fura [sic], Nurse named Sheila, Diane, Jerry Connelly." *Id.*, p. 35.

The resolution of this grievance was identical to the previous one; i.e., it was not processed on the basis that Woodard had failed to attempt informal resolution, had not signed the grievance form (the record indicates the second form was, in fact, signed), and had not provided sufficient details to permit a "meaningful investigation." Again, the grievance officer chose to treat the grievance as "standard" rather than an "emergency." *Id.*, p. 36.

On May 22, 2007, Woodard filed a grievance regarding "Medical/Eye/Severe pain." *Id.*, p. 37. He provided a lengthy narrative of the problem, as follows:

> I have been severly [sic] discriminated against by Health Services of ASP. Not only have I been ignored several times countless times going to Medical about my eye infection I have been made to suffer pain and torment placed upon me by Mr. Connelly, Sue, Sally, Linda, Amy, by misinforming me about my medications even withholding pain medicine I was prescribed by IC doctors, Professionals who know the pain I have suffered after surgerys [sic], having needles inject different antib[i]otics into my eye. I have even been denied health care for months on end after I've reported to health service and been charged co-pays and didn't even get to see the doctor at all. They lied to me just last wk by letting what little pain control I was allowed to me run out and they delibrately [sic] told me Thurs. to come back Friday. Then I'm told no doctor for 3 weeks. They let everything expire

> without telling me beforehand. I even scrimped on the 2.5
> Loratabs [sic] I'd take 2 at 7 am[,] 1 at 4 pm[,] and 1 at 8pm
> to stretch them out instead of 2 each time. They did not warn
> me now I'm waiting to have my eye removed because the
> infection is out of control. . . . I'd like to know how does a
> health care provider say a paitient [sic] doesn't need a
> medication without even examining the person nor even talk
> to them to ask them pain levels, symptoms or times of severe
> attacks of migraines caused by the infection in one's body that
> they have no firsthand knoweledge [sic] of but even the
> trained proffesionals [sic] have treated, operated on, and done
> aftercare follow-ups are still ignored with no conscious [sic]
> of the pain one is going thru and they still ignore the person
> and treat them like their [sic] not even alive or deserve
> medical attn.

*Id.*, pp. 37-39. Under "Action Requested by Offender," Woodard wrote, "What can I
say maybe to be treated like a human being with a serious and most blantant [sic] health
problem." *Id.*, p. 37. He indicated he had attempted informal resolution procedures with
"Everyone at Health Services several times." *Id.* He further indicated his grievance was
an "emergency." *Id.*

As before the grievance officer decided to treat Woodard's grievance as "standard"
rather than "emergency." *Id.*, p. 40. As before, the grievance was not processed on the
basis that Woodard had failed to attempt informal resolution. *Id.*

Woodard immediately filed another grievance containing additional information.
Regarding his attempts at informal resolution, he indicated, "I have exhausted all avenues
meaning Medical Staff, the Warden, counslor [sic], Larry Brixmeyer[.] This has been
going for 6 to 8 months continuously they are going to change another script I received
Weds to get me ready for surgery." *Id.*, p. 41. In addition to the narrative he presented
previously, he attached the following statement:

> Sir, This reply on my grievance is the wall I've ran
> into here for 6 to 8 months now. I have been called to health
> service for non-compliance of the grievance system. I feel
> that I get waylaid in between Mr. Connelly and Dr. Durga's

[sic] purposely. It wasn't to[o] long ago I went there and made an appt. to see the Dr. the next day. The CO came to my cell and told me [Health Services] wanted me there so off I go. Now the only reason I was there was for severe pain from my eye that the IC doctor had already gave me a script but [Health Services] refused to honor it. Anyway I went and never even got to see the Dr. or anyone for that matter. I layed [sic] down in the back and after 3 hours Sally and Sue told me to leave. They added . . . 600 [mg. of] Motrin to the [medications] they gave instead of what the IC doctor put me on. Sir the doctors are trying to save my eye but for the last 7 months I've been literally beat down from [Health Services]. This latest visit to IC has brought me hope that <u>if</u> the doctor can get the pain and soreness controlled so my eye has a chance to heal there might be a chance I can regain maybe 10% of sight. Sir my last visit back in March[,] I believe[,] I had an implant removed to help clear the infection and I was to be put on adequate pain medicine only to be brought back here and those were [denied] and replaced with a very low pain medication which was only given to me for a few days. Since the past 7 weeks has been a nitemare [sic] from hell, so much pain[,] 31 pound weight loss, severe miagrains [sic], sleepless nites [sic] from pain. <u>Every</u> time I approach [Health Services] I get charged 3.00 and turned away. By the way isn't vision one of the 3 things DOC can't charge for. The latest episode had me with no alternative except to file a grievance. Sir I am not a behavior problem and I have voluntarily already completed programs offered Anger Management and AVP. Sally had all my carry-ons confiscated cause she said I didn't pick up my Predisone [sic] on 5-11. Sir I have a kite from 4-26-07 stating to pick up my carry-ons 5-1-07. Sir I ordered my Prilosce [sic] and Vicki informed me that Dr. Durgra's [sic] had not ordered my drops. Luckily I had some left in my cell and Cris found a bottle in the drug cabinet. This is documented by log-in and out also the [Health Services] log. Sir why would I go on 5-11-07 to pick up something I didn't even know was there. I have charts of times and days on my drops. I have 4 ex cellys that will testify I did my eye drops reliogously [sic] without missing. Sir I was prescribed pain meds last Weds. by

19

> Dr. Fuller and Dr. Foulks and it said continue until surgery. Sir they asked me what I thought would be adequate. I did not ask for very strong but a medium mild, 5.00 Loratab [sic]. I was asked if I thought I'd be out of pain my response was I would make do now. [Health Services] ordered one week[']s worth and Dr. Foulks said it[']s going to take at least 4 to 6 wks of healing and absenst [sic] of the pain before he can go back in. Now I will be in pain <u>again</u> for 4 to 6 wks waiting for the oper[ation]. Then the drs will say the same but ya know next time they might say my eyeball is so trashed it needs removed. It almost happened last week. I told them to take it because I'd been in severe pain for so long and he asked me why. He said he sent adequate pain relieve [sic] but I never got it. Sgt. Brickholt was my escort [and] he can verify what I'm saying. Please sir help me save my eyesight.

*Id.*, pp. 44-47.

It appears this second May 22, 2007, grievance was sent directly to the DOC Central Office. On June 6, 2007, a response was issued indicating, "You can not file an appeal to this office. You have not attempted informal resolution." *Id.*, p. 48.

On July 5, 2007, Woodard filed a grievance claiming "Gross Medical Neglaince [sic] and denial of [treat]ments and Medication." *Id.*, p. 49. He included the following description of his complaint:

> I have dealt with ASP's Health Services for 10 months and during this time I have been mistreated, discriminated against and denied proper medical attn and medications recommended and prescribed by Iowa City doctors, this has been brought to several peoples attn during the past ten months only to be ignored or put off. This gross negliance [sic] has lead to the removal of my left eye. I have suffered pain beyond belief and denied all pain meds prescribed to help my eye."

*Id.* Woodard indicated he had attempted informal resolution procedures with "Mr. Feidler, Mr. Connolly, Dr. Durgas [sic], Mr. Burt, Mr. Ferran, All of Health Services, Mr. Larry Brixmer, Dr. O'Brien IMCC." *Id.*

Woodard's grievance was not processed for the stated reason that he had not attempted informal resolution before filing the grievance. *Id.*, p. 50. The grievance officer indicated, "Health Services Director Jerry Connolly informs me that he instructed you to see him in person to discuss this matter. You have not followed his instructions." *Id.*

Woodard filed a grievance on August 1, 2007, for "Medical Negligance [sic]." He provided the following narrative of his complaint:

> I went to [Health Services] on July 16, 07 saw the Dr. on the 17th after a 20 min conversation and examination she agreed to prescribe me Tylenol 500, Motrin 600, creme [sic] for the eye I just had removed, Prilosec, and Disclose [sic], immed after my visit no 5 mins later Sue said she changed it to Motrin, Duoclase [sic], and the Prilosec[.] [S]he wouldn't let me see the Dr [and] she said that[']s the way it will be[.] I was told to report to carry on in 2 to 3 days. I did as I was told [and] all I got was the Motrin, Prilosec and alamag. [sic]. Now alamag is a anti-acid and is used for temperary [sic] stomach problems. Why would a licsensed [sic] Dr. prescribe Prilosec for stomach ulcer and acid reflux then prescribe alamag. This very much shows the Drs orders are not being followed but the nurses choose when ever they want to switch things up. Now I was told if I felt it wasn't right [to] report to sick call what and pay another 3.00 to not get what I was prescribed[.] Haven't I went thru enuff [sic], with the pain and suffering before losing my eye[?] Now they took what little relief Dr. Durgra [sic] prescribed. Also I told Dr. Durgra [sic] I've got the little spots starting in my right eye [and] she said if they get worse let her know.

*Id.*, pp. 51-52. Woodard indicated he had attempted informal resolution with "Mr. Connelly." *Id.*, p. 51.

A Grievance Acknowledgment and Receipt form was provided to Woodard regarding the August 1, 2007, grievance. *Id.*, p. 53. On September 5, 2007, a grievance officer issued the following response to Woodard's grievance:

21

I have reviewed your grievance complaint. . . . ASP Health Services Director RN Jerry Connolly informs me that your medical record indicates, ". . . Inmate Woodard saw our physician on 7/24/07. At that time Inmate Woodard reported floaters in his eye, along with need to renew Prilosec and some generalized body aches and pains and was requesting Tylenol or Motrin for pain. Upon completion of the examination, Dr. Satyavolu ordered Motrin, Prilosec, and Milk of Magnesia for Inmate Woodard's complaint. The doctor's notes indicate Inmate Woodard should try the Motrin before considering addition of Tylenol. On 8/8/07 I responded to a memo from Inmate Woodard regarding his concerns. In that memo, I informed Inmate Woodard that I had reviewed the encounter of 7/24/07. I could not respond to what discussion he had with the doctor as I was not present. I informed Inmate Woodard that the physician ordered Motrin 600 mgs three times a day, Prilosec twice a day, and Milk of Magnesia one time as needed for the next three months. I also informed Inmate Woodard that the physician, on a later date, wrote that if Motrin was not helping to add Tylenol. I instructed Inmate Woodard to let nursing staff [know] if the Motrin was not helping via the appropriate procedure and that he would not be assessed a co-pay fee for this. It is noted Inmate Woodard has a scheduled follow-up with our optometrist scheduled for 8/23/07. Inmate Woodard's concerns have been addressed by our physician. He has received further instruction of the procedure to follow should he believe he needs the additional analgesic of Tylenol. An appointment has been scheduled with our optometrist for review of his eye concerns.

*Id.*, pp. 54-55.

The grievance officer concluded, "Based upon information you have provided as well as information contained above, your description of the medication as provided to you by RN 'Sue' was prescribed by ASP physician Satyavolu. Regarding your concerns for your eye, an appointment has been scheduled with the optometrist for you to address those concerns. I am recommending your grievance complaint be sustained." *Id.*, p. 55.

The defendants argue Woodward failed to follow the written grievance procedure because he failed to attempt informal resolution in some cases, and because he failed to appeal the decisions on his grievances. Regarding informal resolution, Woodard was instructed in response to his grievance dated October 11, 2006, that he was required to list the names of the staff members with whom he had spoken about his problems. However, even when he listed the names of individuals, or at least identified that he had spoken with "everyone" at Health Services, his grievance was not processed on the grounds that he had failed to attempt informal resolution. With no further instructions, the court fails to see how Woodard could have done more.

With regard to his failure to appeal, the defendants assert an inmate "*must* appeal" both the grievance response and any appellate decision by the Warden. Doc. No. 36-2, pp. 8-9. The written grievance policy is not clear that an inmate is required to appeal. The grievance policy states an inmate "may" appeal. The only requirement regarding appeal that appears to be mandatory is that a "grievant must appeal the decision within the stated time limits of the policy. Offender appeals received after the policy time limit expires will not be heard and the prior decision will be upheld." Doc. No. 36-4, p. 17, ¶ D.1. Because this paragraph is immediately followed by others stating an inmate "may appeal," an inmate easily could conclude the mandatory language in paragraph D.1. only applies to the time limits *if* the inmate decides to file an appeal.

The court finds Woodard complied with the grievance procedure to the best of his ability to understand it. The grievance procedure is ambiguous regarding whether an inmate is required to appeal the initial response or the decision prior to filing a lawsuit. In addition, the court finds that in many cases, the grievance officer failed to either recognize Woodard's informal attempts to resolve his problems with the medical staff, or to provide him with further direction regarding what must be done to render his grievance complete and ready for consideration. *See Hart v. Baldwin*, slip op., 2009 WL 3055304 (N.D. Iowa, Sept. 21, 2009) (Bennett, J.) ("Although the requirement of proper

exhaustion might appear to be harsh for prisoners who lack legal training or are poorly educated, the Court has observed that prison grievance systems are generally informal and relatively simple and are not inconsistent with a prisoner's *pro se* responsibilities to comply with deadlines and other requirements in federal court.") (citing *Woodford v. Ngo*, 548 U.S. 81, 103, 126 S. 93, Ct. 2378, 2393, 165 L. Ed. 2d 368 (2006)).

Should the reviewing court disagree that the record establishes Woodard followed the grievance procedure as written, then the undersigned alternatively finds there is a material question of fact regarding whether Woodard properly exhausted his administrative remedies, precluding summary judgment. *See* 42 U.S.C. § 1997e(a); *Woodford v. NGO*, 548 U.S. 81, 93, 126 S. Ct. 2378, 2387, 165 L. Ed. 2d 368 (2006) ("proper exhaustion" under the PLRA attempts to "'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'") (quoting *Porter v. Nussle*, 534 U.S. 516, 525, 122 S. Ct. 983, 988, 152 L. Ed. 2d 12 (2002)); *Hart v. Baldwin*, slip op., 2009 WL 3055304 (N.D. Iowa, Sept. 21, 2009) (Bennett, J.).

Finally, the court notes the defendants included in their Statement of Undisputed Material Facts information about Woodard's "extensive disciplinary history." Doc. No. 36-3, ¶ 3; Doc. No. 36-4, Ex. C, pp. 6-7. This information is irrelevant to the present case or to the defendants' arguments, and the court finds its inclusion to be inappropriate and unnecessary.

## V. *QUALIFIED IMMUNITY*

The defendants argue they are entitled to qualified immunity because Woodard has not alleged a violation of a clearly-established constitutional right that was "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Doc. No. 36-2, p. 10 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)). The defendants assert that absent evidence

they violated a clearly-established constitutional right, they are entitled to qualified immunity. *Id.*

The doctrine of qualified immunity is well settled. The United States Supreme Court recently explained the doctrine as follows:

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 5076, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

*Pearson v. Callahan*, ___ U.S. ___, ___, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). The Court further has explained that qualified immunity issues should be resolved as early as possible in the litigation process:

> Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) (emphasis deleted). . . . Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (*per ciruam*).

*Id.*

The Eighth Circuit Court of Appeals has explained the process courts are to follow in considering qualified immunity questions, as follows:

> Qualified immunity protects a prison official from having to defend against a § 1983 lawsuit premised on the official's performance of discretionary functions as long as the prison official's actions do not violate an inmate's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007) (internal marks omitted). In determining whether a prison official is entitled to qualified immunity, courts generally look first at whether the official's alleged conduct violated the inmate's federal rights at all and, if so, then ask whether the right was clearly established at the time of the conduct. *Irving [v. Dormire]*, 519 F.3d [441,] 446 [(8th Cir. 2008)] (discussing *Saucier v. Katz*, 553 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)); *but see Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 813, 172 L. Ed. 2d 565 (2009) (holding that the *Saucier* two-step process is not "an inflexible requirement"). Where "the unlawfulness of the officers' conduct . . . was not clearly established, [the officers] are entitled to qualified immunity." *Pearson*, 129 S. ct. at 823.

*Norman v. Schuetzle*, 585 F.3d 1097, 1103 (8th Cir. 2009).

Woodard's claims against the defendants in this case are based on deliberate indifference to a serious medical need. A prisoner's constitutional right to necessary medical attention was clearly established at the time of the conduct in question in this case, *see Wilson*, 501 U.S. at 303, 111 S. Ct. at 2326-27, and further, would have been known to any reasonable correctional officer. Denial of necessary medical treatment for a condition as serious as Woodard's clearly would have been unlawful, and its unlawfulness would have been known to the defendants.

The court finds the defendants are not entitled to qualified immunity from Woodard's claims. Taking his claims as true for summary judgment purposes, he has shown exactly the type of constitutional violation for which public officials should be

held accountable. *See Pearson*, 129 S. Ct. at 815. Therefore, summary judgment should be denied and this case should go forward to trial.

## VI. ALLEGED FALSIFICATION OF MEDICAL RECORDS

Woodard asserts the Iowa DOC provided copies of medical records purporting to be his, but that were for dates when Woodard was not incarcerated, or listed health problems he has never had, or purported to show he was seen by doctors on dates when he was not. *See* Doc. No. 50 and attachments.

The defendants respond in the form of an affidavit from the defendant Jerry Connelly, acknowledging that there are "a few clerical errors in the records," but denying that Woodard's records were falsified. Connelly responds to Woodard's allegations regarding each of the records in question by indicating some of the records contain typographical errors, and Woodard was mistaken in his interpretation of the remaining records. *See* Doc. No. 55)

The court finds the defendants' response adequately addresses each of Woodard's concerns regarding his medical records.

## VII. CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED**, unless any party files objections[2] to the report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b) within fourteen (14) days of the service of a copy of this report

---

[2] The parties must specify the parts of the report and recommendation to which objections are made. In addition, the parties must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356, 357-58 (8th Cir. 1990).

and recommendation, that the defendants' motions for summary judgment be **granted** as to the defendant Edward O'Brien, and **denied** as to the remaining defendants.

      **IT IS SO ORDERED.**

      **DATED** this 14th day of January, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT